# United States Court of Appeals
## For the First Circuit

No. 24-1057

KATHYA ROXANA DUARTE DE MARTINEZ,

Petitioner,

v.

PAMELA BONDI,
Attorney General,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, <u>Chief Judge</u>,
and Rikelman, <u>Circuit Judge</u>.[**]

<u>Randy Olen</u> for petitioner.

<u>Sarai M. Aldana</u>, Attorney, Office of Immigration Litigation,
with whom <u>Brian Boynton</u>, Principal Deputy Assistant Attorney
General, Civil Division, <u>Cindy S. Ferrier</u>, Assistant Director, and
<u>Michael C. Heyse</u>, Senior Litigation Counsel, Office of Immigration

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Attorney General Pamela Bondi is automatically substituted for
former Attorney General Merrick B. Garland as Respondent.

[**] Judge Selya heard oral argument in this case and
participated in the initial semble thereafter. His death on
February 22, 2025, ended his involvement in this case. The
remaining two panelists issued this opinion pursuant to 28 U.S.C.
§ 46(d).

Litigation, were on brief, for respondent.

March 19, 2025

**BARRON**, **Chief Judge**.  Kathya Roxana Duarte De Martinez ("Duarte") petitions for review of an order of the Board of Immigration Appeals ("BIA") that affirmed the denial of her application for cancellation of removal.  The petition claims that the BIA erred in concluding that her removal would not result in "exceptional and extremely unusual hardship" to her minor son, who suffers from an intellectual disability.  8 U.S.C. § 1229b(b)(1)(D).  For the reasons explained below, we grant the petition and remand the case for further consideration consistent with this decision.

## I.

Under 8 U.S.C. § 1229b(b)(1), a noncitizen who has been ordered removed may apply to the Attorney General for cancellation of removal.  The Attorney General may grant the application, however, only if the noncitizen shows that she: (1) "has been physically present in the United States for a continuous period of not less than 10 years immediately" before her application for cancellation; (2) "has been a person of good moral character during such period"; (3) "has not been convicted" of certain enumerated offenses; and (4) has "establishe[d] that removal would result in exceptional and extremely unusual hardship to [her] spouse, parent, or child, who is a citizen of the United States or . . . lawfully admitted for permanent residence."  8 U.S.C. § 1229b(b)(1).  If the noncitizen makes this showing, then the

- 3 -

Attorney General must determine whether to exercise her discretion to cancel the noncitizen's order of removal. 8 C.F.R. § 1240.8(d).

In April 2018, the U.S. Department of Homeland Security initiated removal proceedings against Duarte. She conceded her removability and filed an application for cancellation of removal. To prove the fourth statutory criterion for eligibility, she claimed that her removal would cause "exceptional and extremely unusual hardship" to her nine- and ten-year-old sons, A.M. and J.M., both of whom are U.S. citizens.

In response to Duarte's application, an Immigration Judge ("IJ") held a hearing, in which Duarte and her husband, Juan Francisco Martinez ("Martinez"), testified. The IJ found that they testified "credibly," "candidly[,] and consistently with the written documentary materials."[1]

To show that several circumstances particular to A.M. would cause him exceptional and extremely unusual hardship if Duarte were removed to El Salvador, she offered evidence and credible testimony, including from herself and Martinez, that:

- The only school that offers special education services in the neighborhood that she would relocate to in El Salvador conducts those services entirely in Spanish. The only English-language class is English as a second language.

---

[1] The IJ did make one exception to its credibility finding: it found that Duarte and Martinez's testimony about their reporting of income to the Internal Revenue Service was not credible. Neither party, however, argues that this finding is relevant to issues in this petition.

- That same school does not "offer any programs" that would "help [A.M.] learn Spanish through their special education program."

- Although Duarte and Martinez almost exclusively speak Spanish, A.M.'s first language is English. Duarte and Martinez tried to communicate with A.M. in Spanish when he was an infant -- but it quickly became clear that he "did not understand" them. To help A.M. learn how to communicate, they placed him in a specialized therapy program when he was one-and-a-half years old. But because his therapy was conducted in English, he only learned to communicate in that language.

- A.M. cannot communicate in Spanish, including with his own family. Because Duarte and Martinez speak only "a little" English, A.M.'s brother, J.M., translates between him and his parents. A.M. cannot communicate with his grandparents in Spanish.

- A.M.'s disabilities make it "extremely difficult" for him to learn new languages. His speech therapist indicated that she did not know if it would be possible for him to ever learn how to speak Spanish.

- A.M. receives special education services to support his needs in reading, mathematics, writing, independence skills, speech, and language. He also receives occupational therapy. These services are conducted in an individualized or small-group setting.

- Despite several years of individualized special education services in English, A.M. struggles with learning, even in that language. His "severe" "underlying language difficulties [have] significantly impact[ed] [his] ability to learn and succeed in the classroom, and they require intense remediation." He is a fifth grader performing at a first-grade level.

- Recent evaluations show that, even with years of specialized instruction and therapy in English, A.M. has:
  - A "severe language impairment" that impacts his "ability to understand what is being expressed" and to "use gestures, sounds, words, sentences, or writing to communicate" in English.
  - "[S]ignificant difficulties processing, comprehending, and expressing himself with language."

- o Difficulty "understand[ing] relationships between words based on function, place or time" and "spoken directions with increasing complexity."
- o Difficulty "formulat[ing] semantically and grammatically correct spoken sentences" and "listen[ing] and repeat[ing] spoken sentences of increasing length and complexity."
- o "[W]eaknesses in cognitive functioning, particularly in short term memory, visual-spatial functioning, and verbal abilities."
- o A "low to extremely low range of functioning," as indicated by his scoring "below the 5th percentile rank of functioning compared to others his age" in an Adaptive Behavior Assessment.

- Historically, interruption in A.M.'s special education and therapeutic services has resulted in regression, and future interruption is likely to cause him to "regress academically, functionally, and socially." To prevent "serious" regression, he participates in extended school year services.
- A.M.'s learning disability, language disorder, and intellectual disabilities are permanent and will continue through adulthood.

The IJ found that A.M. has an intellectual disability for which he receives special education services. The IJ further found that, despite the services A.M. received, his latest evaluation showed that he is performing at a first-grade level even though he is in fifth grade. The IJ also found that, in addition to his intellectual disability, A.M. has "speech problems" for which he receives occupational therapy. And the IJ found that he participates in a program that "helps him with life skills, such as dressing oneself, learning to cross streets safety, and going to stores to purchase items."

The IJ did find that Duarte "found a program that [A.M.] could join" in El Salvador if she were removed and that it was affordable because it was "within the family's means." The IJ also found that A.M. "understand[s] some Spanish" but made no finding as to whether he could otherwise speak, read, or write in that language.

Based on its factual findings, the IJ determined that the family's relocation to El Salvador "would result in some hardship" to A.M. and J.M. But the IJ concluded that Duarte had not met her burden to show "that the hardship that the children would face rises to the high level of exceptional and extremely unusual hardship required by the statute."

Duarte appealed the IJ's ruling to the BIA, focusing on the hardship that she claimed that A.M would face. The BIA affirmed.

The BIA first rejected Duarte's "assert[ion] that no comparable special education services [to those A.M. was receiving] are available in El Salvador," explaining that the IJ's finding that A.M. "could attend a private school . . . that offers special education services" was not clearly erroneous. The BIA also noted that, to the extent that those services may be "inferior" to A.M.'s current services, "evidence that a qualifying relative will experience a lower standard of living in the country of removal, including a lower standard of medical care, [is]

insufficient in itself to support a finding of exceptional and extremely unusual hardship." Matter of J-J-G-, 27 I. & N. Dec. 808, 812-813 (BIA 2020) (cleaned up).

The BIA separately found no clear error in the IJ's finding that Duarte could pay for the special education program in El Salvador. It thus concluded that Duarte had not shown that A.M. would be "deprived of all schooling or of an opportunity to obtain any education." Matter of Andazola-Rivas, 23 I. & N. Dec. 319, 323 (BIA 2002).

The BIA then rejected Duarte's "argu[ment] that . . . A.M.'s unfamiliarity with Spanish would create additional educational hardship." The BIA observed that "[u]nfortunately, a language barrier is a common hardship resulting from a respondent's removal." In support of this proposition, the BIA cited Matter of Monreal-Aguinaga, 23 I. & N. Dec. 56 (BIA 2001), and Alvarado v. Holder, 743 F.3d 271 (1st Cir. 2014), the latter of which it described as "upholding denial of cancellation of removal where, among other factors, the applicants' son faced a language barrier in his parents' country of removal." In conclusion, the BIA noted that the IJ's finding that A.M. "understands some Spanish" was not clearly erroneous.

In closing, the BIA "acknowledge[d] the difficulties associated with resettling one's family to another country" and that A.M. "may have fewer economic and educational opportunities

outside of the United States."  The BIA also observed that A.M. "will have to adjust to learning in Spanish."  But the BIA concluded that, weighing the factors "cumulatively,"[2] Duarte had not met the "high standard of exceptional and extremely unusual hardship."  In consequence, the BIA dismissed the appeal.

Duarte timely petitioned for our review.

## II.

"Where, as here, 'the BIA adopts the IJ's decision but adds its own gloss, we "review the decisions of both the BIA and the IJ" together.'"  Figueroa v. Garland, 119 F.4th 160, 166 (1st Cir. 2024) (quoting Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023)).  When we analyze the IJ and BIA's opinions "as a unit," we refer to the IJ and BIA collectively as "the agency." Khalil v. Garland, 97 F.4th 54, 61 (1st Cir. 2024).

## III.

The Attorney General begins by challenging our jurisdiction over Duarte's petition.  She points out that 8 U.S.C. § 1252(a)(2)(B) deprives us of jurisdiction over disputes about the "facts underlying any determination on cancellation of

---

[2] As part of this cumulative analysis, the BIA also considered Duarte's argument that her inability to afford medication for her epilepsy would impede her ability to care for her children.  The BIA found no clear error in the IJ's finding that Duarte had not established that her medication would be unavailable to her in El Salvador.  It also concluded that the record lacked evidence regarding the cost of her medication there.

removal." <u>Wilkinson</u> v. <u>Garland</u>, 601 U.S. 209, 225 (2024). The Attorney General contends that Duarte's petition takes issue solely with the agency's factual findings. She thus argues that we must dismiss Duarte's petition on jurisdictional grounds. <u>See</u> <u>id.</u> (noting that "§ 1252(a)(2)'s jurisdiction-stripping provisions . . . . operate to exclude 'agency fact-finding from review'" (quoting <u>Guerrero-Lasprilla</u> v. <u>Barr</u>, 589 U.S. 221, 234-35 (2020))); <u>Patel</u> v. <u>Garland</u>, 596 U.S. 328, 339 (2022) ("[J]udicial review of factfinding is unavailable.").

We agree with the Attorney General that, at times, Duarte's petition does appear to challenge the agency's factual findings. The petition argues, for example, that, given A.M.'s "multiple, severe" mental and physical disabilities, the IJ's observation that A.M. is "physically healthy" is "monstrously erroneous." Further, the petition contends that the IJ's determination that Duarte could afford her medication, control her seizures, and find employment in El Salvador is contradicted by credible testimony and other evidence in the record.

But, although "questions of fact underlying denials of discretionary relief are unreviewable," <u>Wilkinson</u>, 601 U.S. at 219, § 1252(a)(2)(D) makes clear that questions of law remain subject to our review, 8 U.S.C. § 1252(a)(2)(D). And Duarte's petition presents a question of law insofar as it contends that, because the agency failed to consider A.M.'s individualized

- 10 -

circumstances in assessing whether the exceptional and extremely unusual hardship standard has been met, the agency failed to follow its own precedent in applying that standard. See Rosa v. Garland, 114 F.4th 1, 14 (1st Cir. 2024) (explaining that an "argument that the BIA exceeded the scope of its binding precedent . . . is a legal question that we have jurisdiction to review under 8 U.S.C. § 1252(a)(2)(D)"). Thus, even though we lack jurisdiction to consider the portions of the petition that challenge the agency's factual findings, we do have jurisdiction to address this aspect of her petition. And so we must address the merits of this legal challenge to the agency's denial of Duarte's application for cancellation of removal.

## IV.

We begin our merits analysis by describing the relevant BIA precedents that bear both on Duarte's claim of exceptional and extremely unusual hardship to A.M. and her contention that, in assessing whether she had satisfied her burden to show that he would suffer such hardship, the agency was required to have undertaken an individualized inquiry. We then consider her contention that the agency failed to abide by that precedent because it failed to undertake an inquiry of that kind. Because we conclude that the agency did fail to undertake an individualized inquiry, we conclude our analysis by addressing the consequences of the agency's legal error in failing to do so.

- 11 -

Under binding BIA precedent,[3] "[e]xceptional and extremely unusual hardship" is "hardship that is substantially different from, or beyond, that which would normally be expected from the deportation of a[] [noncitizen] with close family members here." Matter of Garcia, 28 I. & N. Dec. 693, 706 (BIA 2023) (cleaned up) (quoting Matter of Monreal-Aguinaga, 23 I. & N. Dec. at 65). In determining whether an applicant for cancellation of removal has satisfied this demanding standard of hardship, the BIA has held, the agency must give "cumulative consideration of all hardship factors." Matter of J-J-G-, 27 I. & N. Dec. at 811; see also Matter of Garcia, 28 I. & N. Dec. at 706. BIA precedent also requires the agency to take account of the "circumstances" and determine whether "the particular facts presented" give rise to exceptional and extremely unusual hardship. Matter of Gonzalez-Recinas, 23 I. & N. Dec. 467, 468-69 (BIA 2002).

Thus, in the end, the success or failure of a claim of exceptional and extremely unusual hardship depends "on its own

---

[3] Duarte does not separately challenge the BIA's interpretation of "exceptional and extremely unusual hardship" as outlined in its binding precedents. While she does cite Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), in support of her contention that the agency deserves no deference in its interpretation of the hardship standard in this case, she waived this contention by first making it in her reply brief. Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015).

merits and on the particular facts presented." Id. (emphasis added); see also Matter of Andazola-Rivas, 23 I. & N. Dec. at 323 (noting that each case "must be considered on its own individual facts"). It follows, therefore, that, under BIA precedents, the agency's determination of whether a qualifying family member would experience the hardship at issue based "on the particular facts presented" requires "consideration" of that family member's individual "circumstances," including his "age, health," and "how a lower standard of living or adverse country conditions in the country of return might affect" him. Matter of Gonzalez-Recinas, 23 I. & N. Dec. at 468-69.

**B.**

In her application for cancellation of removal, Duarte asserts that A.M. will suffer an exceptional and extremely unusual hardship because of her removal for the following reasons: He will have to go with her to El Salvador; once there, he will be completely deprived of educational services due to his particular circumstances; and, in consequence of that deprivation, he will suffer "detrimental consequences" not only to his "education, but [also to] his physical development and social engagement." Indeed, she contends that this educational deprivation will render him, given his specific characteristics, "unable to function normally in a social setting" for "the rest of his life."

In advancing this claim of exceptional and extremely unusual hardship, Duarte emphasizes the impact of A.M.'s particular disabilities on his ability to learn while in El Salvador. She contends that they are of a kind that will prevent him from learning any subject -- including Spanish -- if forced to move to El Salvador, given the lack of English-language special education services there and the absence of any special education services that would teach him Spanish. She also contends that this hardship would result, given his particular disabilities, even if he can "understand some Spanish."

Against this backdrop, the petition identifies the agency's legal error as inhering in its failure to address whether A.M.'s individual circumstances, relating to his particular intellectual disabilities, would have the specific consequences that she contends that her removal would have for him. Rather than undertaking that individualized inquiry, she contends, the agency addressed the claimed effect of the removal "as if it would accrue to a normal, healthy child" who did not speak, read, or write Spanish.

As an initial matter, we note that, in defining the exceptional and extremely unusual hardship standard here, the BIA relied on its precedent in Monreal, which held that a child who has "compelling special needs in school" may render their parent a "strong applicant" for cancellation of removal. 23 I. & N. Dec.

at 63.  At various points the agency also acknowledged that the demanding hardship standard is satisfied if a qualifying relative "would be deprived of all schooling or <u>of an opportunity to obtain any education</u>."  <u>Matter of Andazola-Rivas</u>, 23 I. & N. Dec. at 323 (emphasis added).

Thus, we understand the agency to have agreed with Duarte that if the record showed that A.M. would be deprived of "all schooling or <u>of an opportunity to obtain any education</u>" in consequence of his inability to learn Spanish, <u>id.</u> (emphasis added), then she would have shown that he would suffer the requisite hardship, given the impact that deprivation would have on his particular ability "to function normally in a social setting" for "the rest of his life."  As a result, the critical question concerns whether Duarte is right that the agency failed to consider A.M.'s individual circumstances in determining that the record failed to show the claimed qualifying hardship.  We conclude that she is.[4]

---

[4]  In her response to the petition, the Attorney General argues that the substantial evidence standard should guide our review of the agency's application of the hardship standard in this case.  But we "need not decide here precisely what . . . standard of review" applies because, although our review is "deferential," we would "reach the same conclusion regardless" of the applicable standard.  <u>Figueroa</u> v. <u>Garland</u>, 119 F.4th 160, 166 n.7 (1st Cir. 2024).

- 15 -

## 1.

In affirming the IJ's ruling that Duarte had not met her burden as to the claimed hardship to A.M., the BIA observed that "a language barrier is a common hardship resulting from a respondent's removal." It also cited to two cases -- <u>Monreal</u> and <u>Alvarado</u> -- as support for its determination. These features of the BIA's ruling fail to indicate that the agency considered A.M.'s specific circumstances in determining the impact on him in particular of "the language barrier" that he would face in El Salvador.

The BIA's reference to a language barrier being common obviously does not itself indicate that the agency was attending to how a language barrier would affect A.M. specifically, given the claimed unique challenges that he faced when it came to language acquisition. After all, the agency at no point suggested that the record failed to show that he faced such special challenges.

The reference to the "common" nature of a language barrier also fails to indicate that the agency was attending to how A.M. in particular -- given his intellectual disability -- would be specially impacted by an inability to overcome that "common" barrier. And, again, the agency at no point suggested that Duarte failed to show that, in that event, A.M.

would face the challenges she claimed that he would face throughout his life.

Moreover, in citing to Monreal, the BIA appears to have been doing so only to provide support for the proposition that a hardship that is "common" is insufficient to satisfy the hardship standard. Indeed, the specific portion of Monreal that the BIA cited says as much. It explains that the "exceptional and extremely unusual hardship" standard, unlike the historical "extreme hardship" standard, requires hardship that is "'substantially' beyond the ordinary hardship that would be expected when a close family member leaves this country." 23 I. & N. Dec. at 62 (quoting H.R. Rep. No. 104-828, at 213 (1996) (Conf. Rep.)).

Thus, by citing to this part of Monreal after observing that "a language barrier is a common hardship resulting from a respondent's removal," the BIA, as we read this ruling, was not addressing what a language barrier would mean for A.M., given his specific disabilities. It was merely correctly explaining that, because such a barrier is "ordinary" or "common" to persons who must move to another country in which the language is a new one, it is not commonly the kind of impediment that gives rise to an exceptional or extremely unusual hardship.[5]

---

[5] We note that even an "ordinary" language barrier may be relevant to the cumulative hardship analysis. See Matter of

We note, too, that the facts of Monreal markedly differ from the circumstances presented here. The qualifying children there were "in good health," and the eldest qualifying child testified that he was "doing well in school," took "classes in both English and Spanish," and could "speak, read, and write in both languages." 23 I. & N. Dec. at 64. So, we do not see how the BIA's reference to that prior BIA precedent shows that the asserted legal error by the agency did not occur.

The BIA's citation to Alvarado also does not show that the agency engaged in the requisite individualized consideration in considering Duarte's hardship claim with respect to A.M. To be sure, in Alvarado, there was a claim that the qualifying relative's "inability to read, write, or fluently speak Spanish would . . . hinder his ability to receive an education" in the country of removal. 743 F.3d at 273. But notably, there was no allegation that the relative -- the applicant's son -- could never learn Spanish. Nor was there any allegation that his inability to do so would deprive him of an opportunity to obtain any education, "function normally in a social setting," or receive support for his "physical development."

_____

Gonzalez-Recinas, 23 I. & N. Dec. 467, 472 (BIA 2002) (holding that the qualifying relatives' "unfamiliarity with the Spanish language" was relevant insofar as it "combine[d]" with other factors "to render the hardship . . . exceptional and extremely unusual").

To the contrary, the applicants for cancellation of removal there claimed that their son possessed "superior intellectual ability" and was performing "one grade level or higher than his peers." Alvarado, 743 F.3d at 273. His giftedness was so pronounced, the applicants argued, that a "lack of quality teachers and enrichment programs for high-achieving students" would cause him exceptional and extremely unusual hardship. Id.

Thus, although the applicants in Alvarado claimed that their son's "poor Spanish skills would" cause him some "difficult[ies]," there was no suggestion that his circumstances showed that he would never learn Spanish if provided only the educational services shown to be available to him in the country to which he would be removed. Id. In fact, the evidence of his giftedness suggested the opposite. The BIA thus in no way indicated in this case that, by relying on Alvarado, it had undertaken an individualized inquiry into the circumstances of A.M. in particular, given the obvious differences in the challenges a language barrier presents to a gifted child relative to a child with difficulties in acquiring language like A.M.

**2.**

In nonetheless contending that the agency did consider the "circumstances" or "particular facts presented" here, Matter of Gonzalez-Recinas, 23 I. & N. Dec. at 468-69, the Attorney General does not dispute that, if the circumstances demonstrated

- 19 -

that A.M. could not learn in El Salvador, he would suffer exceptional and extremely unusual hardship. She asserts only that the agency did consider A.M.'s particular circumstances and determined that, even accounting for them, he could learn in El Salvador, such that his hardship would be of a kind common to a child having to confront a language barrier.

In support of this assertion, the Attorney General directs our attention to the agency's findings that A.M. "understands some Spanish" and "could attend a private school . . . that offers special education services." She contends that these findings necessarily imply that the agency found that A.M. could learn at that school. As a result, she contends that Duarte's petition is merely challenging the factual basis for the individualized determination regarding the claimed hardship as to A.M. We are not persuaded.

We cannot understand the agency, in referencing A.M.'s ability to "understand[] some Spanish," to have grappled with whether his specific circumstances would prevent him from being able to <u>learn</u> in El Salvador. Yet the hardship claim as to A.M. is predicated on his inability to learn with special educational services in Spanish, given his special difficulties in acquiring language. Nor is there any indication that the agency otherwise undertook the required individualized inquiry. In fact, the BIA's

seeming comparison of A.M. to the intellectually gifted child in Alvarado indicates that the agency did not.

The Attorney General asserts that the agency's reliance on Alvarado was justified because children with "superior intellectual abilities" and learning disabilities both have specialized educational needs. But the BIA's precedents require consideration of the "age, health, and circumstances of the qualifying family member[]." Matter of Gonzalez-Recinas, 23 I. & N. Dec. at 468. Those precedents provide no support for the agency conducting its individualized hardship inquiry in a way that would treat a child with A.M.'s intellectual disability and a gifted child as facing equivalent challenges in consequence of having to confront a language barrier -- common though such a barrier is as a general matter. Nor did the BIA in this case offer any explanation of how so treating children in such different circumstances accords with the BIA precedents requiring that the individual circumstances of the hardship claimant be addressed. See, e.g., id. Thus, in referencing the factual finding about A.M.'s ability to understand some Spanish, the Attorney General does not provide a reason for us to conclude that Duarte's asserted legal error by the BIA did not occur.

The Attorney General does also point to the fact that the BIA relied on the finding that A.M. "could attend a private school . . . in El Salvador that offers special education

- 21 -

services" in rejecting Duarte's claim that he would suffer exceptional and extremely unusual hardship due to the language barrier that he would confront in El Salvador. But, here, too, we cannot agree that, in doing so, the BIA evidenced that it undertook an individualized inquiry into the claim of hardship as to A.M.

We may assume that, in general, the ability to attend a school and receive specialized educational services in Spanish suffices to support a determination that a child will not suffer more than a common hardship in having to move to a new country and receive instruction in a new language. But, even if that were so, we do not understand the agency, merely by invoking the finding that A.M. would be able to "attend" a school and "receive" such services in El Salvador, to have thereby addressed whether his specific challenges in acquiring a new language would "deprive[] [him] of all schooling or of an opportunity to obtain any education." Matter of Andazola-Rivas, 23 I. & N. at 323. The agency thus neglected a critical facet of the hardship inquiry, because it failed to undertake that inquiry in a manner that focused on A.M.'s individualized circumstances.

We note in that regard that the BIA referred to the finding in question in response to Duarte's argument that no "comparable special education services" were "available" in El Salvador (emphasis added). Yet, the BIA did not at any point address whether the educational services that it found would be

"available" to A.M. in El Salvador in fact would be "comparable" to those that Duarte claimed A.M. had been receiving. And that is even though Duarte claimed that the services he was receiving in English in this country were the kind of services that he would need to receive to avoid suffering the exceptional and extremely unusual hardship that she claimed he otherwise would experience in consequence of his specific circumstances.

Indeed, consistent with this understanding of the BIA's analysis, the BIA noted that the fact of "inferior" educational services is generally insufficient, in itself, to meet the statutory standard for showing a qualifying hardship. But, of course, that observation about the impact of inferior services on claimants as a general matter fails to take account of how the inferior nature of the particular educational services in this case might impact a child facing the learning challenges that A.M. assertedly confronts.

We also note that, in this same discussion, the BIA emphasized that Duarte could afford the school program that it found was "available" to A.M. in El Salvador. The BIA's reference to the finding that A.M. "could attend" a private school offering special educational services thus appears to have been merely an acknowledgement that A.M. "could join" the program at the school making those services "available" to him. We see no indication that the BIA was thereby addressing whether A.M., given his

individual circumstances, could learn from those services, such that he would not be deprived of a meaningful opportunity to receive an education in consequence of those circumstances.

### C.

At bottom, Duarte argued that her removal would cause A.M. exceptional and extremely unusual hardship because of his unique circumstances: She claimed that because of his disabilities and the absence of English-language special education services, A.M. could never learn Spanish or learn in Spanish. She further argued that his inability to do so would prevent him from obtaining an education or properly socializing with the world around him. Because nothing in the agency's decision assures us that it meaningfully considered these "circumstances" or the "particular facts presented" here, we conclude that the agency legally erred.[6] Matter of Gonzalez-Recinas, 23 I. & N. Dec. at 468-69.

---

[6] In a Rule 28(j) letter, the Attorney General additionally argues that Duarte's hardship claim fails because the agency "frequently" considers and rejects hardship claims based on learning disabilities. In support of this contention, she highlights a handful of unpublished decisions in which the agency has rejected a hardship claim based on a learning disability and a circuit court has affirmed that decision. But that argument suffers from the same issue as the agency's decision below -- it assumes that the hardships faced by all persons with learning disabilities are the same, regardless of the circumstances presented in each particular case. Because the hardship inquiry requires consideration of those individual circumstances, we thus find the Attorney General's contention unpersuasive.

**V.**

Given our conclusion that the agency committed legal error in denying Duarte's application for cancellation of removal, we must address the appropriate remedy. "It is a well-established maxim of administrative law that . . . 'if the agency has not considered all relevant factors, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" Calcutt v. FDIC, 598 U.S. 623, 628-29 (2023) (per curiam) (second alteration in original) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)); see also R.I. Higher Educ. Assistance Auth. v. Sec'y, U.S. Dep't of Educ., 929 F.2d 844, 857 (1st Cir. 1991). Under the so-called "ordinary remand rule," an error of this kind would thus typically result in vacatur of the agency's decision and a remand to the agency to permit it to conduct the proper inquiry in the first instance. Castañeda-Castillo v. Holder, 638 F.3d 354, 363 (1st Cir. 2011) (cleaned up) (quoting Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (per curiam)).

Duarte, however, contends that we must instead reverse the agency's decision and grant her application for cancellation of removal. While the Attorney General asserts that Duarte's petition should instead be denied on the merits, she does not directly address Duarte's specific request for reversal. And neither party offers any argument as to why this case does -- or

does not -- present the kind of "special" or "rare circumstance[]" to which the ordinary remand rule does not apply. Gonzales, 547 U.S. at 187; I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002) (quoting Fla. Power & Light Co., 470 U.S. at 744); see also Castañeda-Castillo, 638 F.3d at 363 n.9 (citing Ucelo-Gomez v. Gonzales, 464 F.3d 163, 170 (2d Cir. 2006)).

Given the sparse briefing on this issue and the posture of this case, we conclude that remand is appropriate. The sole legal issue in Duarte's petition concerns the agency's application of the hardship standard. But even if we reversed the agency as to that issue, remand would still be necessary to allow the agency to pass on the remaining statutory criteria for removal. See 8 U.S.C. § 1229b(b)(1). Given that reality, we think it appropriate to remand to the agency on all issues -- including hardship -- to permit it to properly apply its precedents in the first instance.

In doing so, we reiterate that on remand the agency must consider whether, due to his particular circumstances, A.M. will suffer exceptional and extremely unusual hardship. Matter of Gonzalez-Recinas, 23 I. & N. Dec. at 469; Matter of Andazola-Rivas, 23 I. & N. Dec. at 323. We note that, with regard to whether Duarte has shown that her removal will result in A.M. being "deprived of all schooling or of an opportunity to obtain any

- 26 -

education,"[7]  Matter of Andazola-Rivas, 23 I. & N. Dec. at 323, the agency found the testimony from her and Martinez credible. Thus, in light of their testimony and the record evidence concerning A.M. detailed above, it is not evident how -- under any standard of review -- the agency could conclude that Duarte's removal would not deprive A.M. of an education in El Salvador and thus have the consequences for his ability to function in life that Duarte asserts.  But we leave that issue for the agency to determine in the first instance, so that in our review of any subsequent determination, the agency's "informed discussion and analysis" may "help [us] later determine whether its decision exceeds the leeway that the law provides."  Orlando Ventura, 537 U.S. at 17.

Accordingly, we **grant** the petition, **vacate** the BIA's decision, and **remand** for further proceedings consistent with this opinion.

---

[7]  We note that, even if the agency concludes that A.M. will not be deprived of all schooling or an opportunity to obtain an education, it will still be required to consider whether the cumulative hardship that A.M. would suffer -- including any hardship that would result from any deficiencies in the education available to him -- "combine to render the hardship" exceptional and extremely unusual.  Matter of Gonzalez-Recinas, 23 I. & N. Dec. at 472.  In engaging in that inquiry, the agency would also be required to consider A.M.'s particular circumstances, including, for example, how any educational deficiencies would impact other areas of his life.